NATIONAL KIDNEY PATIENTS
ASSOCIATION, et al.

v.

Louis W. SULLIVAN, M.D., Secretary,
Department of Health and Human
Services, et al., Appellants.

No. 91–5073.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 15, 1991.

Decided March 13, 1992.

Rehearing and Rehearing En Banc
Denied June 1, 1992.

Robert M. Loeb, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Anthony J. Steinmeyer, Atty., Washington, D.C., were on the brief, for appellants.

Nathan Lewin, Washington, D.C., for appellees.

Before: RUTH BADER GINSBURG, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

For slightly over 13 months the Department of Health and Human Services made payments to Home Intensive Care, Inc. ("HIC") under a preliminary injunction issued by the district court. As a result of congressional action, that injunction has been modified and the modified injunction has been vacated as moot. While it was in effect, however, HHS paid HIC millions of dollars—HHS says $15 million—more than

it otherwise would have. Here it asks that we reverse the district court's decision preventing it from recouping those sums, and instead allow it both to recover on a $750,-000 injunction bond and to apply its usual administrative recoupment processes to the transactions with HIC. We agree, and reverse the order of the district court.

### Background

Part B of Medicare provides supplementary medical insurance for the aged and disabled, generally covering 80% of the "reasonable charge" for physicians' services, durable medical equipment, out-patient hospital services, lab services, and so on. HHS enters into contracts with private insurance carriers—in this case with Blue Cross and Blue Shield of Florida ("Blue Cross")—who handle the routine administration of part B. Carriers like Blue Cross establish "reasonable" charges that providers can recover under Medicare.

In 1972 Congress extended part B coverage to individuals who have permanent kidney failure (regardless of age), and who therefore require transplantation or dialysis. 42 U.S.C. § 1395rr. In doing so, it established two alternative methods of payment, commonly known as "Method I" and "Method II". Method I provides for reimbursement by HHS to a *certified* facility for dialysis treatment administered by the facility. 42 U.S.C. §§ 1395ff(b)(1)(A), 1395rr(b)(7). Method II—now obsolete—provided for reimbursement by HHS to or on behalf of individuals for the costs of home dialysis supplies and equipment *supplied by an entity other than a certified facility.* 42 U.S.C. § 1395rr(b)(1)(B). Although both methods encompassed home dialysis, Method II enabled patients who self-dialysized at home to contract directly for equipment and supplies rather than receiving them from a certified facility. Method II coverage was limited to a "reasonable charge". 42 U.S.C. § 1395u(b)(3).

"Reasonable charge" determinations for some time proceeded largely under two criteria—the supplier's customary charges and rates prevailing in the locality. See 42 CFR § 405.502(a)(1) & (2). In February

1986 HHS proposed to amplify § 405.502 with a new subsection, (g), to catch instances where those criteria would result in "unreasonably excessive charges." See Notice of Proposed Rule, Medicare Program; Reasonable Charge Limitations, 51 Fed.Reg. 5726, 5728 (1986). Before HHS made the regulation final, Congress adopted a similar provision, 42 U.S.C. § 1395u(b)(8), requiring HHS to describe by regulation instances where standard criteria would lead to a charge that was so "grossly excessive" (or "grossly deficient") as not to be "inherently reasonable". Pub.L. No. 99–272 § 9304(a), now codified at 42 U.S.C. § 1395u(b)(8)(A). The new statutory subsection also required HHS to state the factors to be considered in establishing "reasonable" charges. *Id.*

After the statutory amendment, HHS adopted its proposed 42 CFR § 405.502(g), setting forth a non-exhaustive list of factors that might trigger scrutiny for inherent unreasonableness, and stating criteria for setting reasonable charges when the existing charge was found grossly excessive. As adopted, subsection (g) not only authorized the Health Care Financing Administration ("HCFA") to use these factors to establish reasonable charge limits, but gave similar authority at the local level to carriers such as Blue Cross. Final Rule, Medicare Program; Reasonable Charge Limitations, 51 Fed.Reg. 28710 (1986). In its district court suit, HIC claimed that the extension of authority to carriers was unlawful for want of notice and comment on that issue.

In February 1988 HCFA issued a letter to carriers, Transmittal Letter 1237 ("TL 1237"), on the subject of home dialysis. It advised them to consider the application of the inherent unreasonableness criteria to Method II reimbursement for home dialysis. It asserted that "[v]arious data" suggested that Method II providers were paid primarily by Medicare, that they did not engage in price competition, that their charges often greatly exceeded their costs, and that in significant respects they provided fewer items than were provided for less money under Method I. See Joint Appendix ("J.A.") 51–52. Although TL 1237 did

not bar Method II charges in excess of Method I levels, it certainly suggested that any such excesses were quite likely to be "inherently unreasonable".

In July 1988 Blue Cross started to exercise its authority under § 405.502(g), issuing a notice that proposed to reduce the maximum monthly allowance for home dialysis supplies and equipment under Method II from $3,100 to $1,625 (the Method I reasonable amount), and calling for more data. In October 1988, after surveying the data, Blue Cross adopted the proposed ceiling, effective January 1, 1989.

Soon after Blue Cross's announcement, plaintiffs—HIC (which supplies dialysis under Method II to about 1000 Florida patients), a renal dialysis patients' group, and 10 individual renal dialysis patients receiving equipment from HIC—proceeded directly to district court, seeking a preliminary injunction barring HHS, HCFA, and Blue Cross from implementing the new rate reduction. Plaintiffs (usually referred to here simply as HIC) complained that (1) HHS's grant of "inherent unreasonableness" authority to carriers as well as to HCFA should have been preceded by notice and comment; (2) TL 1237 was a substantive rule requiring notice and comment; and (3) any capping of the Method II reimbursement at Method I levels was arbitrary and capricious. In December 1988 the district court issued the requested injunction. Though initially setting no injunction bond at all, the court in February 1989 required a nominal one—$1,000.

The federal defendants promptly appealed on a number of grounds, including the size of the bond. In December 1989 we remanded the record to the district court, instructing it to set "an appropriate bond" and stating that Medicare had already paid over $18 million to vendors under the injunction, an amount for which the $1000 bond was "clearly inadequate to ensure repayment". *National Kidney Patients Ass'n v. Sullivan*, Order, No. 89-5039 (D.C.Cir., Dec. 8, 1989).

Shortly after our ruling, Congress commanded what the district court had enjoined. Section 6203(b)(1) of the 1989 Omnibus Budget Reconciliation Act amended 42 U.S.C. § 1395rr(b)(7) to cap Method II payments at the Method I level, effective February 1, 1990. On that date the district court modified its injunction to allow reduction of payments, and on the next day it ordered HIC to post a $750,000 bond. J.A. 90–92. HHS and Blue Cross again appealed, arguing that the injunction had been improvidently granted. This court held that the appeal had been mooted, and vacated the injunction. *National Kidney Patients Ass'n v. Sullivan*, 902 F.2d 51, 55 (D.C.Cir.1990). As to the defendants' claims for recoupment of amounts paid out under the injunction, the court said that those claims were not properly presented on appeal, but must first be determined by the district court. *Id.* at 54.

On remand, the district court held that HHS could recover neither the $750,000 covered by bond nor any other payments under the injunction. *National Kidney Patients Ass'n v. Bowen*, 754 F.Supp. 900 (D.D.C.1991). The court stated that its initial ruling granting the injunction was correct as to both jurisdiction and the merits, and that in any case it would be inequitable to permit HHS to recover from HIC.

The defendants appeal, arguing that the district court had no jurisdiction, that it was wrong on the merits, and that HHS should be entitled to recovery of the amounts paid under the injunction. The recovery would come in the form of payment on the bond and through application of HHS's standard administrative process for recoupment of excess amounts paid to a Medicare provider.

## The District Court's Jurisdiction

■ Plaintiffs argue that even if the district court were altogether in error as to jurisdiction or the merits, "equitable considerations" would require us to uphold its denial of relief on the bond and in restitution. Appellees' Brief at 17. But for obvious reasons the law draws a vital distinction in this context between a valid and an invalid decree. See, e.g., *Coyne–Delany Co. v. Capital Dev. Bd.*, 717 F.2d 385 (7th Cir.1983). Accordingly, we must consider

whether the district court had jurisdiction. As we conclude that it did not, we need not—indeed, cannot—address the merits of HIC's claim.

Resolution of the jurisdictional issue requires a choice between two lines of precedent. On one side is a line of Social Security cases—*Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)—followed by a part A Medicare decision, *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). These construe §§ 405(g) and 405(h) of the Social Security Act, 42 U.S.C. §§ 405(g) & (h), both as originally enacted and as later incorporated by reference into Medicare part A, as establishing a rigorous scheme requiring both "presentment" (an absolute prerequisite) and exhaustion (a prerequisite that may be excused only under rather limited conditions). On the other side is a rule that the Supreme Court developed for Medicare part B disputes at a time when the statutes treated them differently from ones under part A. Under this approach, disputes over "amounts" were (per statute) completely removed from judicial review, see *United States v. Erika, Inc.,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982), whereas disputes over "methodology" could be brought under 28 U.S.C. § 1331's provision for general federal question jurisdiction, subject only to conventional exhaustion requirements, see *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986).

If the *Salfi–Ringer* line controls, then HIC's failure to "present" its claim to the Secretary's delegate, the insurance carrier, bars jurisdiction. If the *Erika–Michigan Academy* line controls, the district court plainly had jurisdiction, as the dispute was over methodology. Because Congress has now brought Medicare part B disputes under the same regime as ones under part A, and because the Supreme Court has treated part A disputes as indistinguishable from Social Security ones, we find the *Salfi–Ringer* line controlling.

First the basic statutory scheme: Two titles of the Social Security Act are pertinent—Title II, which contains the Old Age, Survivors, and Disability Insurance, Supplemental Security Income, and Social Security Disability programs; and Title XVIII, which contains the Medicare program, Parts A and B (the latter being our concern here). Title II includes jurisdictional provisions that Congress for the most part incorporated into Title XVIII. Section 405(g) of Title II, 42 U.S.C. § 405(g), provides for district court review of claims by persons seeking benefits under any of the Title II programs:

> Any individual, *after* any final decision of the Secretary made after a hearing to which he was a party, ... may obtain a review of such decision by a civil action.... brought in [a] district court of the United States....

42 U.S.C. § 405(g) (emphasis added). Section 405(h), 42 U.S.C. § 405(h), makes § 405(g) the *exclusive* avenue for judicial review of administrative decisions under Title II, displacing federal court jurisdiction under 28 U.S.C. § 1331:

> The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h).

The Medicare title, Title XVIII, incorporates the jurisdictional sections of Title II: Section 1395ff(b) expressly incorporates § 405(g) of Title II. We give the text first in the form it had *before* congressional amendment on October 21, 1986:

> (1) Any individual dissatisfied with any determination under subsection (a) of this section as to— ...

(C) the amount of benefits under part A ... of this subchapter (including a determination where such amount is determined to be zero) ... shall be entitled to a hearing thereon by the Secretary to the same extent as is provided in section 405(b) of this title and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title.

42 U.S.C. § 1395ff(b) (1982). The October 21, 1986 amendment extended review under § 1395ff(b)(1)(C) to claims under *part B* as well as under part A. Pub.L. No. 99–509, § 9341(a)(1)(B). Thus, subsection (C) now reads:

(C) the amount of benefits under part A *or part B* of this subchapter (including a determination where such amount is determined to be zero)

42 U.S.C. § 1395ff(b)(1)(C) (1988) (emphasis added).

Finally, § 1395ii expressly incorporates § 405(h), with its preclusive effect on other jurisdiction:

The provisions of sections 406, and 416(j) of this title, and of subsections (a), (d), (e), (*h*), (i), (j), (k), and (*l*) of section 405 of this title, shall also apply with respect to this subchapter to the same extent as they are applicable with respect to subchapter II of this chapter.

42 U.S.C. § 1395ii (1988) (emphasis added).

Among the cases applying these provisions to claims involving Title II, the clearest is *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). There the Court explained that § 405(g)'s provision for review "after any final decision of the Secretary made after a hearing" imposed two requirements, a "nonwaivable" requirement "that a claim for benefits shall have been *presented* to the Secretary", *id.* at 328, 96 S.Ct. at 897 (emphasis added), and a waivable requirement that administrative remedies provided by the Secretary be exhausted, *id.* The presentment requirement—arising out of § 405(g)'s requirement of "some decision by the Secretary", *id.*, "is an essential and distinct precondition for § 405(g) jurisdiction", *id.* at 329. It is a "crucial prerequisite". *Id.*

The "by the Secretary" phrase, however, is not understood literally—if it were, presentment would merge with exhaustion. The Court found presentment in *Eldridge*, for example, on the basis of the claimants' having presented their claims to the local Social Security office and on appeal to the regional office. *Id.* See also *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

In *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), the Court extended the *Salfi–Eldridge* line of cases to part A of Medicare, observing that judicial review of Medicare claims "is available only after the Secretary renders a 'final decision' on the claim, *in the same manner* as is provided in 42 U.S.C. § 405(g) for old age and disability claims arising under Title II of the Social Security Act", citing 42 U.S.C. § 1395ff(b)(1)(C). *Id.* at 605 (emphasis added). (At the time that statement was inapplicable as to part B claims, but the remark appears entirely accurate by virtue of the October 1986 amendment.) The decision cites *Eldridge* and *Salfi* throughout, without betraying the slightest doubt that what was true of § 405(h) in its original context was equally true when it was transported to Medicare by § 1395ii. Justice Stevens's opinion, concurring in part and dissenting in part, makes the same assumption. *Ringer*, 466 U.S. at 627–47, 104 S.Ct. at 2028–38.

*Ringer* is of special interest for our purposes in that one respondent (Ringer himself) lost because he sought a judicial invalidation of the Secretary's policy against reimbursement of a specific class of operation that he contemplated having in the *future*. As "Congress clearly foreclosed the possibility of obtaining such advisory opinions from the Secretary herself", the Court refused to read § 405(h) so as "to undercut that choice by allowing federal judges to issue such advisory opinions." *Id.* at 621–22, 104 S.Ct. at 2025. Though the exact meaning of "presentment" may be unclear, the requirement seems well suited to preventing a provider from securing an advance decision such as HIC obtained here. Indeed, HIC conceded at oral

argument that it had not presented its claim, a concession that is almost certainly sound, as it sued before providing the services covered by the injunction.

In two cases decided before the October 1986 amendment, the Supreme Court interpreted the statute's application to Medicare part B. In the first, *United States v. Erika, Inc.*, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982), it found that the statute precluded any judicial review of "determinations of the amount of Part B awards." *Id.* at 208, 102 S.Ct. at 1654. This followed rather straightforwardly from § 1395ff(b)'s provision for review "of any determination ... as to ... the amount of benefits under part A", coupled with § 1395ii's incorporation of § 405(h)'s preclusion rule. The Court also noted legislative history indicating congressional concern that otherwise the courts might be flooded with "minor matters". *Id.* at 209, 102 S.Ct. at 1655.

Four years later—but four months *before* Congress amended § 1395ff(b) to extend subsection (1)(C)'s coverage to part B—the Court found that the preclusion as to part B claims did not encompass attacks on the *method* by which the Secretary determined part B amounts. In *Bowen v. Michigan Academy of Family Physicians*, the Court stressed the "strong presumption that Congress intends judicial review of administrative action", 476 U.S. at 670, 106 S.Ct. at 2135, and declined to "indulge the Government's assumption that Congress ... intended no review at all of substantial statutory and constitutional challenges to the Secretary's administration of Part B", *id.* at 680, 106 S.Ct. at 2141. It called the government's view "extreme", *id.*, and said that its acceptance would raise a "serious constitutional question", *id.* at 681 n. 12, 106 S.Ct. at 2141 n. 12. It also noted its reliance in *Erika* on legislative history attributing the preclusion of review of part B *amounts* determinations to an expectation that they would involve a horde of trivial claims. *Id.* at 675, 680, 106 S.Ct. at 2138, 2141.

If judicial review of Medicare part B disputes is still governed by the amounts/methodology distinction of *Michi-*

*gan Academy*, HIC's attacks on § 405.-502(g) and on TL 1237 would seem to fall squarely on the methodology side of the line. While ordinary administrative law principles such as the requirement of ripeness might bar some claims, such as the attack on TL 1237, compare *Public Citizen v. NRC*, 940 F.2d 679 (D.C.Cir.1991), they would likely not defeat the district court's jurisdiction.

We think, however, that the October 1986 amendment makes the *Eldridge–Ringer* line of authority the sole determinant of jurisdiction for Medicare claims, both parts A and B. First, it seems inescapable that the same rule must govern parts A and B; the special treatment of part B, based on the pre-October 1986 statutory differences, cannot survive the elimination of those differences. While the House Report accompanying the amendment focused on adding judicial review for part B claimants who previously enjoyed none (i.e., ones asserting only "amounts" claims), it also explained that the amendment established "an appeals procedure under Part B that is modeled after that available under Part A". H.R.Rep. No. 727, 99th Cong., 1st Sess. 95, reprinted in 1986 U.S.C.C.A.N. 3607, 3685. There is, indeed, no difference in the statutory provisions governing judicial review of parts A and B, at least insofar as plaintiffs may be affected.

Accordingly, if the *Michigan Academy* analysis were to still control part B, it would also control part A. That in turn would require a decision that *Michigan Academy* either overruled *Ringer* (sub silentio, as it certainly did not purport to do so) or assumed that it was only an "amount" case, not a methodology dispute. The latter would be a stretch, however, as *Ringer* revolved around the legality of the Secretary's policy statement expressing her *generic* approach to BCBR (bilateral carotid body resection) operations performed to relieve respiratory distress. See 466 U.S. at 605, 607, 104 S.Ct. at 2016, 2017. Even with this revisionist view of *Ringer*, there would be the question of why the courts should find such a gulf between Social Security (Title II) and Medicare, when Con-

gress seems to have used the first as a template for the second.

Second, as our summary of *Michigan Academy* makes clear, the Court rested the decision largely on the presumption of reviewability, which would have been completely defeated if § 1395ff(b)(1)(C)'s pre-October 1986 exclusion of part B were read to encompass methodology disputes. With the October 1986 amendment, part B claims will not go unreviewed; review simply awaits *initial* administrative determination in a concrete setting.

This is not to say that there are no fragments out of which to construct a contrary argument. HIC discerns help in a provision of the October 1986 amendments, § 1395ff(b)(4), which provides that there shall be no judicial review of a "regulation or instruction which relates to a method for determining the amount of payment under part B" issued before January 1, 1981. 42 U.S.C. § 1395ff(b)(4) (1988). From this it infers an intent to leave methodology claims where *Michigan Academy* put them. But the inference is hardly necessary. The section appears simply to carve out one set of claims—methodology claims based on departmental decisions before 1981—from the general rule that all part B claims, including methodology disputes that arise in disposition of specific, concrete claims, are judicially reviewable under the pattern established by §§ 405(g) & (h).

Appellees also suggest that the legislative history of the October 1986 amendment reflects a focus on affording part B beneficiaries a better process for resolution of disputes over *amounts*, because of concern about "the fairness and adequacy of [the] Part B appeals process". H.R.Rep. No. 727, 99th Cong., 1st Sess. 95, reprinted in 1986 U.S.C.C.A.N. 3607, 3685. The same passage also notes that the assumption underlying the initial preclusion—that disputes would involve only trivial amounts—had proven unfounded: "Today ... Part B claims often involve very substantial amounts". *Id.*

Indeed, the legislative history does show a focus on what Congress was affirmatively doing—opening up part B "amounts" determinations to judicial review on the same basis as disputes under part A. The focus is hardly surprising. But it says nothing about whether methodology disputes should continue exempt from the preclusive effect of § 405(h) (imported to Medicare by § 1395ii), once they can be resolved in the § 405(g) format as aspects of concrete disputes over amounts.

We note a passage in *Michigan Academy* that might be thought to provide mild support for appellees' reading. The Court there said that there were "matters which Congress did not delegate to private carriers, such as challenges to the validity of the Secretary's instructions and regulations," 476 U.S. at 680, 106 S.Ct. at 2141, so that these, the Court said, were properly cognizable in courts of law. From this it might be argued that the special role of carriers and intermediaries in Medicare argues for allowing quick end-runs to court. The carriers' role might also answer the question we raised earlier, as to why Congress might have intended a different scheme for Medicare; it might have believed that carriers, as private profit-seeking entities, would be less apt to treat applications fairly and lawfully.[1]

The inference seems weak, however. The October 21, 1986 amendment makes clear that persons affected by an adverse decision of a *carrier* may now obtain review *by the Secretary*, see 42 U.S.C. § 1395ff(b)(1) (1988), so that the administrative structure is plainly available to correct whatever systemic flaws may be ascribed to carriers. Further, the Court in *Michigan Academy* was concerned not with timing, but with reviewability *vel non.* In that context it not unnaturally found an anomaly in consigning final resolution of methodology disputes to entities which lacked the competence or authority to resolve them. Given the October 1986 amendments, however, application of the

---

1. The inference of systemic differences might depend on the way in which carriers are com- pensated, which the record does not disclose.

*Eldridge–Salfi* line to Medicare does not leave methodology disputes in the hands of carriers; it simply means that they are fed through the administrative-judicial system as parts of disputes over actual amounts.

We have addressed this issue at what may seem undue length because we note that some of our sister circuit courts have *assumed* the continued application of *Michigan Academy* to part B Medicare issues. Appellees cite *Bodimetric Health Services v. Aetna Life & Casualty*, 903 F.2d 480 (7th Cir.1990); *Texas Medical Ass'n v. Sullivan*, 875 F.2d 1160 (5th Cir.1989); and *Association of Seat Lift Manufacturers v. Bowen*, 858 F.2d 308, 316–17 (6th Cir.1988). *McCuin v. Secretary of Health & Human Services*, 817 F.2d 161, 164–66, (1st Cir. 1987), *Kuritzky v. Blue Shield of Western New York, Inc.*, 850 F.2d 126, 128 (2d Cir. 1988), and *Isaacs v. Bowen*, 865 F.2d 468, 471 (2d Cir.1989), are to the same effect. But as *not one* of these cases addresses or even mentions the 1986 amendment, the courts' continued use of the amounts/methodology distinction is not surprising.

### Damages and Restitution

■ Having concluded that the district court lacked jurisdiction to issue its injunction, we turn to the implications for HHS's quest for damages and restitution. As to damages, a defendant injured by a wrongfully issued preliminary injunction is presumptively entitled to recovery on the injunction bond. As the Seventh Circuit said in *Coyne–Delany Co. v. Capital Dev. Bd.*, 717 F.2d 385 (7th Cir.1983), this approach is virtually required by the text of Rule 65(c). Although the Rule does not explicitly address the disposition of the bond once the injunction is found wrongful, payment to the injured defendant seems almost inescapable, since the Rule imposes a requirement of security ("in such sum as the court deems proper") for the precise purpose of assuring compensation of the defendant for the resulting losses if the injunction proves to have been wrongfully granted. *Id.* at 390–91. Moreover, the court reasoned, this presumption—the majority view—would make the law "more predictable" than a rule of open-ended judicial discretion and

would discourage plaintiffs from seeking preliminary injunctions on weak "though not necessarily frivolous" grounds. *Id.* at 391–92. The preference for allowance of damages is a solid one; it justifies disallowance only where there is "good reason", and does not allow the district court "carte blanche to excuse the plaintiff". *Id.* at 391. We agree with this analysis, except insofar as it understood our previous ruling in *Page Communications Engineers, Inc. v. Froehlke*, 475 F.2d 994 (D.C.Cir.1973), to be incompatible.

In *Page* we rejected a claim that Rule 65(c) automatically entitled defendants to recovery on the bond on a showing of damage, regardless of the equities of the case. *Id.* at 997. We clearly regarded those equities as leaning toward the plaintiff; although we spoke loosely of the plaintiff's "good faith", arguably suggesting that that was enough to negate recovery on the bond, we also noted that the injunction might never have been granted if the government defendant had brought a specific study to the court's attention in a timely fashion. *Id.* Compare *Coyne–Delany*, 717 F.2d at 392 (noting that defendant's failure to mitigate damages could be a good reason to overcome the presumption in favor of damages within the bond). Accordingly, we do not read *Page* as adopting a maverick view but rather as in accord with the accepted presumption in favor of recovery.

Without that presumption, the bond would fail to accomplish an important goal, that of forcing the plaintiff to consider the injury to be inflicted on its adversary in deciding whether to press ahead in its quest for a preliminary injunction. The deterrence of flimsy claims depends on this. Compare Note, Interlocutory Injunctions and the Injunction Bond, 73 Harv. L.Rev. 333, 342 (1959), making a parallel argument as to the incentives of the *court:* "[T]o eliminate effectively the factor of possible injury to the defendant from those to be considered in determining whether to grant interlocutory relief, the injunction bond must assure the defendant of indemnity in every case in which the injunction

issued erroneously." See also Note, Recovery for Wrongful Interlocutory Injunctions Under Rule 65(c), 99 Harv.L.Rev. 828 (1986).

In the exercise of discretion as to enforcement of the bond, the district court clearly disregarded the presumption in favor of recovery, instead placing a burden on defendants to show that recovery was in the interest of equity. See 754 F.Supp. at 904. Its consideration of factors that it regarded as relevant is useful, however, in addressing the proper exercise of discretion under the presumption. It discussed five factors, none of which (alone or in the aggregate) is enough to overcome the presumption. The first two are that the case was brought in good faith and was not frivolous. *Id.* But these are merely baseline premises; if the plaintiff flunks either of them the presumption in favor of enforcement congeals virtually into rock. Compare *Coyne–Delany*, 717 F.2d at 390 (plaintiff's good faith not justification for withholding recovery).

Third, the district court asserted that HIC had received no unjust enrichment; as it received the compelled payments in exchange for dialysis services rendered to patients, the moneys "were not all profit". 754 F.Supp. at 904. In fact the record does not reveal the size of HIC's profit over the 13 months during which the injunction enabled it to persist in charging Method II rates (double those for Method I) in the face of administrative determinations to the contrary. But in any event the calculation of damages on an injunction bond looks to the injury to defendants, not unjust enrichment of plaintiffs. Any such shift in focus would plainly blunt the bond's incentive effects.

Fourth, the district court suggested that the "public interest" favors encouraging plaintiffs to challenge agencies' interpretations of their governing statutes. *Id.* But

this completely overlooks a key purpose of the *bond* and the presumption of enforceability—to make plaintiffs consider the damage they may inflict by pressing ahead with a possibly losing claim. The presumption expresses a judgment that already subsumes such generic policy considerations as the public interest in providing judicial interpretations of statutes.

Finally, the court said that only the passage of a new law by Congress—the Omnibus Budget Reconciliation Act of 1989— caused the injunction to be vacated. While true in a historical sense (passage of the statute led the district court to modify its injunction, and the modification mooted defendants' appeal), the argument is false in a legal sense: our decision that the district court lacked jurisdiction is wholly independent of the intervening statute and depends solely on our reading of the pre-existing statutory provisions for judicial review.[2]

Thus we turn to the calculation of the defendants' damages under the bond. Defendants' position appears to be that the court should simply take the difference between the rate paid under the injunction (about $3000), subtract the capped rate (about $1500), and multiply by the number of patient months. Given HIC's approximately 1000 patients, the calculation leads to a figure vastly exceeding the $750,000 covered by the bond. The method has the virtue of simplicity; further, it corresponds to the way many similar remedies—such as utility rate refunds—are computed.

Plaintiffs' approach is more dynamic. It starts with the proposition that neither it nor others would supply home dialysis if the Method II price were capped at Method I levels. (A more modest version of the proposition, that providers would supply *less* home dialysis if the price were cut from $3000 to $1500, would seem to flow readily from the usual assumption that supply is price elastic.)[3] Moreover, they

---

**2.** Plaintiffs' brief largely tracks the factors mentioned by the district court, see Appellees' Brief at 20–26; to the extent that it invokes additional factors, they do not assist.

**3.** This is not to say that defendants' theory is necessarily inconsistent with supply being price

elastic. One might view HIC as selling its services during the injunction's effective period at the *expected value* of the price—its value weighted in accordance with HIC's estimates of the probabilities of various outcomes. For instance, if they regarded the injunction as having a 50–50 chance of being upheld, and assumed

say, if home dialysis were unavailable, the patients would incur Medicare-reimbursable expenses, such as transportation expenses, *exceeding* the Method I v. II difference in cost. The upshot is the counterintuitive claim that the injunction *saved* the government money. See Appellees' Brief at 27–28. They further argue that evidence that they put into the record—mainly in the district court's hearing on the proper amount of the bond—supports this view.

The district court never addressed the computation of damages, having decided that for equitable reasons none should be awarded no matter what the correct level. Accordingly, we do not undertake to resolve the issues here, but remand the case for the purpose of computing damages to be collected on the bond. The initial step must be a reasoned choice between the two approaches. Clearly there are precedents for both—for defendants', as we noted, public utility rate refunds; for plaintiffs', many complex commercial litigations. See, e.g., *Polaroid Corp. v. Eastman Kodak Co.*, 16 U.S.P.Q.2d 1481 (D.Mass.1990). The district court should make the initial decision as to which is most suitable in the present context.

This brings us to the next issue—whether HHS may recover more than the amount of the bond. The government accepts the proposition that in the absence of plaintiff bad faith or frivolousness, it could not recover *damages* in excess of the bond. See *Coyne–Delany*, 717 F.2d at 393–94. Rather, it argues that a defendant can recover in *restitution* sums not covered by a bond but paid to a plaintiff as a result of a subsequently invalidated injunction, citing (among other cases) *Arkadelphia Milling Co. v. St. Louis S.W. Ry. Co.*, 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517 (1919), and *Mitchell v. Riegel Textile, Inc.*, 259 F.2d 954, 955 (D.C.Cir.1958); see also *Coyne–*

*Delany*, 717 F.2d at 393 (noting the possibility and citing *Mitchell*).

HIC argues that the precedents do not support restitution in these circumstances. While it seems to concede that restitution is not governed by the rule capping damages at the level of the bond, it distinguishes both *Arkadelphia* and *Mitchell* as cases where the amount recoverable in restitution was clearly ascertainable. Appellee's Brief at 29–30. Here, by contrast, HHS received Method II services in exchange for the payments, conceivably of value equal to the charge. Further, in *Arkadelphia*, the injunction had been issued under an explicit provision for "refund in every instance". 249 U.S. at 138, 39 S.Ct. at 239.

Neither of these distinctions works. It simply is not a principle of restitution that it is available only when the sums are indisputable. For example, almost any restitution for performance of services, see *Restatement of Restitution* § 40, will require calculation of the reasonable value of the services. For examples as to benefits conferred under a judgment, see *United States v. 3,317.39 Acres of Land, More or Less, in Jefferson County, Arkansas*, 481 F.2d 417, 419–20 (8th Cir.1973); *Kane v. Motor Vessel Leda*, 355 F.Supp. 796, 801–05 (E.D.La.1972), aff'd, 491 F.2d 899 (5th Cir.1974). Moreover, in both *Arkadelphia* and *Mitchell* the restitution was set in the context of an *exchange* (in *Arkadelphia*, money in exchange for railway services; in *Mitchell*, money in exchange for labor services). Obviously it was open to the plaintiff to have asserted, as plaintiffs have here, that without the injunction the amount of services supplied and purchased would have been different. In neither case did the court hint that such an assertion would have induced it to back away from awarding restitution. Indeed, were that the rule, plaintiffs (and others subject to restitution) could often escape it at will.[4]

that restitution would be afforded if it were not, then they were selling for (a) a certain $1500, plus (b) a 50–50 chance at another $1500, or a total expected value of $2250. Thus, defendants' theory may be justified as seeing HIC as having sold the services for $1500 plus a gamble that proved to be a losing one.

4. More generally, where a party raises elasticities of supply or demand in disputed computations of restitution, both the complexity of the resulting calculation, and the point noted in footnote 3, might militate against considering their possible effect.

Similarly, while it is true that in *Mitchell* the parties agreed on the amount of the underpayments (certain textile mills had secured an injunction allowing them to pay their workers *less* than a statutory minimum), see 259 F.2d at 955, we placed no reliance on the point. Any restitution principle would be severely undermined if its enforcement depended on the parties' prior agreement as to the precise amounts involved. Finally, while in *Arkadelphia* there was prior provision for reimbursement, the Court did not rely on it and to have done so would have drastically narrowed the principle of restitution.

We need not here address the exact formulae for restitution. Under the Medicare legislation HHS has established elaborate procedures for recoupment of overpayments to suppliers. See generally *Chaves County Home Health Service, Inc. v. Sullivan*, 931 F.2d 914 (D.C.Cir.1991). While the parties have not briefed the substantive principles of recoupment, HHS asks only that the district court order be removed as an impediment to their application. To the extent that those substantive principles (1) accord with HHS's statutory authority and (2) are properly applicable to overpayments of the sort involved here (as HHS implicitly asserts), they would appear to control. Accordingly, we vacate the district court judgment to the extent that it purports to interfere with HHS's application of its recoupment procedures. When those procedures have run their full course, HIC may, if not content with the outcome, seek judicial relief in an appropriate forum.

Accordingly, the judgment of the district court is reversed and the case remanded to it solely for resolution of the dispute over the amount of damages that defendants may recover under the bond.

*So ordered.*