[622 NYS2d 820]

In the Matter of PACIFIC SALMON UNLIMITED et al., Respondents, v NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION et al., Appellants.

Third Department, February 23, 1995

## APPEARANCES OF COUNSEL

*Dennis C. Vacco, Attorney-General,* Albany *(Kathleen Liston Morrison, Peter H. Schiff* and *Douglas H. Ward* of counsel), for appellants.

*Ronald H. Sinzheimer,* Albany *(Peter J. Molinaro* of counsel), for respondents.

**OPINION OF THE COURT**

CASEY, J.

When Pacific salmon were initially introduced into Lakes Ontario and Erie, it was believed that the species would not take a lure during their migration within tributaries of the lakes and that the fish were destined to die after spawning. Accordingly, respondent State Department of Environmental Conservation (hereinafter the Department) allowed the practice of snatching* with respect to the salmon. When experience, research and tests demonstrated that this belief was erroneous and that Pacific salmon, in a migrating state, would come to a lure if undisturbed, the Department decided to consider permitting only the practice of angling, which is the statutorily preferred method of taking all fish except in the case of commercial fisheries (see, ECL 11-1301 [1]).

Accordingly, after studying the matter, the Department adopted an amendment to its regulations to phase in a ban on snatching as a permissible technique for taking migrating Pacific salmon from certain tributaries of Lake Ontario and Lake Erie after the close of the 1993 season (see, 6 NYCRR 10.2). The amended regulation provided for a uniform shortened snatching season in 1992 and 1993 of one month, down from a previous three-month season, and prohibited the use of that technique thereafter. One of the 15 affected tributaries, the Salmon River, previously had a two-month season. The stated purpose of the regulation was to make angling (see, ECL 11-0103 [12] [b]) the only legal method of taking migrating Pacific salmon. The phase-in was designed to provide snatchers with time to develop angling skills while the salmon were still in the tributaries and to allow businesses which service snatchers time to adjust their marketing and inventory away from snatching and toward angling. The change-over to angling was intended to promote angling as the preferred legal method of sport fishing. By doing so, the conflicts that had arisen between snatchers and anglers would be eliminated; the use of stream corridors for other purposes such as hiking and picnicking would be enhanced; the inevitable snatching of other species of fish would cease; angling for other species such as Atlantic salmon and trout would be

---

* "Snatching" or "snagging" allows fish that will not respond to bait or artificial lure to be taken on hooks, baited or not, that are jerked through the water to come into contact with the migrating fish so that they might be caught and taken from the water.

promoted; and a drastic reduction in monofilament line litter and sinkers in streams would occur. Furthermore, the crowding that resulted from snatching, and the necessary high level of enforcement staffing to control the littering, illegal harvesting, vandalism and other problems associated with congested conditions, would be contained. Additionally, the widespread snatching that had arisen along prohibited areas would be curtailed. In sum, according to the Department, the numerous problems associated with snatching indirectly and directly could be solved and the promotion of the practice of angling would be enhanced if the Department's objective of prohibiting snatching was realized, which was the goal of the amendment.

◼ Realizing that allowing the practice of snatching in the first place was a mistake, the Department also recognized that the elimination of the practice would be a concern to businesses dependent on snatching expenditures. Petitioners, who own businesses which provide goods and services to snatchers, claim that this concern was not adequately addressed. Petitioners also claim that respondents improperly relied on a 1984 survey of fishermen at the Salmon River. According to respondent Bruce Shupp, however, the Salmon River was a test case and was used because it was the most heavily fished tributary of Lake Ontario. The study committee that was formed concluded that it was reasonable to anticipate that the Salmon River fishing would be predictive of the Great Lakes fishing as a whole. Inasmuch as this determination by respondents involved factual findings within the agency's expertise, it must be accorded great weight and deference *(see, Flacke v Onondaga Landfill Sys.,* 69 NY2d 355, 363). Petitioners have not shown that the determination is arbitrary, unfair or unreliable *(see, Matter of Mercy Hosp. v New York State Dept. of Social Servs.,* 79 NY2d 197, 204).

◼ Contrary to petitioners' claim, respondents adequately recognized, considered and evaluated the relevant competing factors when they decided to implement the prohibition of snatching *(cf., Matter of Binghamton-Johnson City Joint Sewage Bd. v New York State Dept. of Envtl. Conservation,* 159 AD2d 887, 888). Considering the statutory preference for angling as the method of sport fishing, and based on all the negative effects and problems associated with snatching, respondents concluded that elimination was necessary. However, due to the economic concern the elimination was phased rather than immediate. Respondents issued a regulatory im-

pact statement which contained the information required by State Administrative Procedure Act § 202-a (3). In the circumstances, it is our view that the measure was adopted in substantial compliance with State Administrative Procedure Act § 202-a.

Petitioners complain that adoption of the rule, which has an adverse economic effect on small businesses, required a regulatory flexibility analysis (see, State Administrative Procedure Act § 202-b). Respondents claim such analysis is not required because the rule does not regulate small businesses. We agree with respondents. In contrast to State Administrative Procedure Act § 202-a (1), which refers to "undue deleterious economic effects * * * of the rule upon persons * * * *directly or indirectly affected by it*" (emphasis supplied), State Administrative Procedure Act § 202-b (1) refers to "any adverse economic impact of the rule on small businesses". Pursuant to State Administrative Procedure Act § 202-b (3) (a), no regulatory flexibility analysis is required for "any rule which does not impose an adverse economic impact on small businesses and which the agency finds would not impose reporting, record keeping or other compliance requirements on small businesses". It is undisputed that respondents made the requisite findings as to reporting, record keeping and other compliance requirements.

We are of the view that in determining whether the rule imposes an economic impact on small businesses, the focus should be on those persons or entities directly affected by the rule, not on all small businesses that might experience some indirect economic effect because of the application of the rule to others. It is likely that many new rules could have some indirect economic effects far beyond the economic impact of the rule on those to whom it applies, analogous to the ripple effect of a stone dropped in a pool of water. For example, in this case, there might be an economic impact not only on small businesses that sell goods and services to snatchers, but also small businesses that manufacture those goods, and if the rule results in a reduction in the number of fishermen who come to a particular area, the economic effect could extend to hotels, restaurants and gas stations. Had the Legislature intended State Administrative Procedure Act § 202-b to apply to small businesses indirectly affected by the rule, it would have so provided. The regulatory flexibility requirement is inapplicable in this case because of the absence of an adverse impact on small businesses (see, *Matter of GASDA, Ltd. v*

*Adduci,* 179 AD2d 173, 175) and, therefore, the question of whether respondents issued an adequate regulatory flexibility analysis is irrelevant.

Contrary to Supreme Court, we conclude that the rule was adopted in substantial compliance with State Administrative Procedure Act §§ 202-a and 202-b *(see, Matter of Binghamton-Johnson City Joint Sewage Bd. v New York State Dept. of Envtl. Conservation, supra).* The judgment should therefore be reversed, the determination confirmed and the petition dismissed.

CARDONA, P. J., MIKOLL, WHITE and YESAWICH JR., JJ., concur.

Ordered that the judgment is reversed, on the law, without costs, determination confirmed and petition dismissed.