**GARDEN CITY TREATMENT CENTER, INC.**

v.

**COORDINATED HEALTH PARTNERS, INC., et al.**

No. 2003–517–Appeal.

Supreme Court of Rhode Island.

July 14, 2004.

Robert D. Wieck, Providence, for Plaintiff.

Steven E. Snow, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and SUTTELL, JJ.

## OPINION

PER CURIAM.

This appeal presents a fairly narrow and straightforward issue. In a contract between a medical services corporation that operates a prepaid program of health services for subscribers and a medical service provider, does the use of the word "audit," without further definition or limitation, permit the use of statistical sampling and extrapolation of claims to calculate alleged overpayments? The defendants, Blue Cross and Blue Shield of Rhode Island (Blue Cross) and Coordinated Health Partners, Inc. (Blue CHiP) (collectively, defendants), appeal from a summary judgment in favor of Garden City Treatment Center, Inc. (Garden City or plaintiff). The motion justice found that the language was clear and the contract unambiguous, and ruled that it did not authorize the statistical and extrapolation methodology. Because our *de novo* "audit" yields the same result, we affirm.

This case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After considering the arguments of counsel and examining the record and the memoranda filed by the parties, we are of the opinion that cause has not been shown, and we proceed to address defendant's appeal at this time.

### Facts and Travel

Garden City is a licensed emergency care facility in Cranston. Blue Cross is a nonprofit hospital and medical services corporation. Among its capacities, Blue

Cross is the carrier and intermediary for the Medicare program in Rhode Island. In April 1999, Garden City and Blue Cross entered into a Participating Provider Agreement (the Blue Cross agreement) for the term April 1, 1999, through March 31, 2001. This agreement was renewed automatically for an additional year. According to the terms of the Blue Cross agreement, Blue Cross was required to pay or reimburse Garden City for all covered medical services provided to Blue Cross subscribers according to particular billing codes recorded on a subscriber-patient's medical chart.

Besides reimbursing Garden City for medical services that it provided for Blue Cross subscribers, the Blue Cross agreement required Garden City to "maintain appropriately complete medical records for each Subscriber that [Garden City] treats, in accordance with standards of the profession and as [Blue Cross] may reasonably require." The agreement also allowed Blue Cross "upon request" to verify all subscriber medical records "for the purposes of monitoring billing * * *." The agreement also contained a provision that allowed Blue Cross to "audit" Garden City's financial records as they pertain to Blue Cross subscribers. This provision and the corresponding Blue CHiP provision are the subject of the present appeal. The "audit" provision provided as follows:

"[Blue Cross] shall have the right at no cost to [Garden City] to perform audits upon all of [Garden City's] financial records as they pertain to any of the Subscribers. Any such audit of [Garden City's] records shall be performed in accordance with the requirements of applicable statutes and regulations concerning confidentiality of information."

Furthermore, the agreement gave Blue Cross the right to recover any overpayments made to Garden City for services that Blue Cross determined were "medically inappropriate for the purposes of reimbursement."

Blue CHiP is a licensed health maintenance organization (HMO) and subsidiary of Blue Cross. It entered into a Non–Institutional Ancillary Provider Agreement (Blue CHiP agreement) that ran for the same term as the Blue Cross agreement, and was similarly renewed. The Blue CHiP agreement provided reimbursement to Garden City for health-care services provided to Blue CHiP members according to terms similar to those in the Blue Cross agreement. The Blue CHiP agreement contained a parallel provision that gave Blue CHiP access to Garden City's billing and medical records relating to health-care services provided to Blue CHiP members. This access to Garden City's records was allowed for compliance with applicable regulations and "program administrative purposes" including "billing verification, assessing the quality of care, medical necessity and appropriateness of care provided to Members * * *." The relevant Blue CHiP "audit" provision allows Blue CHiP "to inspect, evaluate, and audit any contracts, books, documents, papers and/or records of * * * [Garden City] * * * which relate to any aspect of the services performed by * * * [Garden City] in connection with the operation and maintenance of BlueCHiP for Medicare." Furthermore, Blue CHiP had the right to recover any overpayments made to Garden City. The agreement gave Blue CHiP the option to recover any overpayments to Garden City, either by refund or by offsetting them against future payments to Garden City.

Of further significance to this appeal is that neither the Blue Cross nor the Blue CHiP agreements defined the term "audit." Neither mentioned that sampling or extrapolation techniques could be em-

ployed when performing audits and neither referred to any sources outside of the agreements in reference to performing audits.

In March 2001, Blue Cross conducted an audit of Garden City's claims for reimbursement for the year 2000. In conducting the audit, Blue Cross reviewed 163 claims and adjusted 74 of them purportedly because the submitted patient records did not support the rate at which Garden City sought reimbursement. Because 74 of the 163 submitted claims were in error, an error rate of 45 percent, Blue Cross applied that error rate to all of the claims that Garden City submitted in 2000. Garden City complained, and Blue Cross adjusted its figures, but still found that 60 of the 163 claims reviewed were in error. This revised audit resulted in an error rate of 36 percent. Blue Cross then took the error rate from the 163 claims sampled and multiplied that rate by the 22,518 total claims that Garden City filed for 2000. Accordingly, Blue Cross found that 8,106.48 of the total claims submitted purportedly were in error. In addition, Blue Cross found that there was an average error of $15.47 per claim sampled. This resulted in an alleged overcharge of $125,407.24 for the claims that Garden City submitted for 2000.[1] Including undocumented claims, Blue Cross claimed that Garden City was responsible for $125,549.24 in overcharges.

In June 2001, Blue CHiP audited the claims that Garden City submitted for Blue CHiP commercial members for the year 2000.[2] Blue CHiP employed an identical extrapolation method to the 165 Garden City claims that it reviewed. Blue CHiP said that 48 of the 165 claims re-

quired adjustment because of overcharges, an error rate of 29 percent. Accordingly, 989.19 of the 3,411 total claims that Garden City submitted to Blue CHiP were in error. Blue CHiP also said that the forty-eight errant claims averaged $35.79 in overcharges. Therefore, Blue CHiP said that Garden City overcharged it $35,403.11 for all the claims at issue in the audit.

At the same time, Blue CHiP audited an additional 149 claims that Garden City submitted on behalf of Blue CHiP's Medicare members. In this audit, Blue CHiP reported that 75 of the 149 claims were adjusted because of overcharges, for an error rate of 50 percent. Blue CHiP applied this error rate to the 1,193 total claims in the audit and found that 596.50 of the claims were in error. It also said that the errors averaged $29.89 per claim. Accordingly, Blue CHiP multiplied $29.89 by 596.50 claims for a total of $17,829.38 for the claims under review in the audit.

As a result of these audits, Blue Cross and Blue CHiP sent a letter and an invoice demanding payment for $178,481.73 in total overcharges. Garden City disputed the results of the Blue Cross and Blue CHiP audits, and did not reimburse the companies for any of the alleged overpayments. The parties met to discuss a potential resolution of the claims, but the meeting was unsuccessful. Blue Cross and Blue CHiP then collected the alleged overpayments by offsetting them against future claim payments that Garden City submitted. On December 7, 2001, Garden City filed suit, alleging breach of contract against defendants.

Blue Shield next conducted an audit of the Medicare claims that Garden City sub-

---

1. Eight additional claims were adjusted for "no order and/or reports" for an additional $142. This brought the total adjustment to $125,549.24.

2. Blue CHiP did two simultaneous audits on Garden City's claims.

mitted for the period July 1, 1999, through June 30, 2000. A letter from Blue Cross revealed that Garden City was chosen for the audit because computer-generated data revealed a higher occurrence of certain procedure codes as compared with a peer group of service providers. As a result of this audit, Blue Cross requested an additional $951.76 reimbursement for overpayments from Garden City. However, Blue Cross reviewed all these claims and did not employ the extrapolation method to arrive at its figures.

Blue Cross and Blue CHiP resolutely continued their course of dealing and engaged in another round of audits in June and July 2002. These audits encompassed claims paid during the year 2001 and part of 2002. The audits for both years broke down along nearly identical lines to the previous audits. That is, Blue Cross conducted an audit, and Blue CHiP divided its audits between commercial and Medicare. Blue Cross and Blue CHiP employed the same sampling and extrapolation method to arrive at their results.

The Blue Cross audit for 2001 resulted in an error rate of 54 percent applied over 23,900 claims, for a total of 12,906 claims with projected errors. The average adjustment per claim was $28.76, which resulted in an alleged overcharge of $371,176.56. The Blue Cross audit for January to April 2002 resulted in an error rate of 43 percent applied over 7,941 claims, for a total of 3,414.63 claims with projected errors. The average adjustment per claim was $26.64, which resulted in an alleged overcharge of $90,965.74.

The Blue CHiP commercial audit for 2001 resulted in an error rate of 40 percent applied over 2,027 claims, for a total of 810.80 claims with projected errors.

The average adjustment per claim was $31.45, which resulted in an alleged overcharge of $25,499.66. The Blue CHiP commercial audit for January to April 2002 resulted in an error rate of 53 percent applied over 664 claims, for a total of 351.92 claims with projected errors. The average adjustment per claim was $45.61, which resulted in an alleged overcharge of $16,051.07.

The Blue CHiP Medicare audit for 2001 resulted in an error rate of 54 percent applied over 1,320 claims, for a total of 712.80 claims with projected errors. The average adjustment per claim was $30.83, which resulted in an alleged overcharge of $21,975.62. The Blue CHiP Medicare audit covering January to April 2002 resulted in an error rate of 37 percent applied over 433 claims, for a total of 160.21 claims with projected errors. The average adjustment per claim was $32.27, which resulted in an alleged overcharge of $6,402.17. Furthermore, there were two "Rite Care" audits.[3] The 2001 Rite Care audit resulted in $16.28 of alleged overpayments. The January to April 2002 Rite Care audit resulted in $288.62 of alleged overpayments.

The combined projected overcharges for 2001 and first-quarter 2002 audits totaled $532,070.82. The total of all overcharges, including the Rite Care audits, came to $532,375.70. As a result of these audits, Blue Cross and Blue CHiP billed Garden City for $532,375.70 in reimbursements. In response, counsel for Garden City sent a letter to the Blue Cross billing department informing Blue Cross that Garden City disputed the results of "each and every" audit for which it was billed. Garden City then filed an amended complaint, which renewed its previous breach of con-

---

3. It is unclear from the audit spreadsheet whether Blue Cross or Blue CHiP conducted these audits although the amended complaint indicates that Blue CHiP conducted these audits. In addition, these audits did not involve extrapolations.

tract counts and included two new counts for breach of contract "as a result of the anticipated offsets" that Blue Cross and Blue CHiP would employ against Garden City. The amended complaint also included a count requesting injunctive relief against Blue Cross and Blue CHiP enjoining them from offsetting any alleged overpayments resulting from the 2001 and 2002 audits. Garden City asserted that "[i]f the Defendants are permitted to offset an additional $532,375.70 in alleged overpayments * * * [it] will no longer be able to maintain its Emergency Care Facility."

The hearing justice subsequently granted Garden City's request for a preliminary injunction with respect to the 2001 and 2002 Blue Cross audits, and the 2001 and 2002 Blue CHiP commercial audits on January 17, 2003. However, Garden City's request was denied with respect to the 2001 and 2002 Blue CHiP Medicare audits, and the Rite Care audits. The hearing justice noted that the Blue CHiP Medicaid audits are governed by federal guidelines and standards, so the plaintiff did not seek summary judgment based on those audits. Those audits are not at issue in the present appeal.

Thereafter, Garden City filed a motion for partial summary judgment on the original breach of contract counts, and further requested a permanent injunction against the offsets it said were imminent in its amended complaint. Garden City's motion was heard in Superior Court on April 22, 2003.[4] At the hearing, counsel for Garden City argued that Blue Cross and Blue CHiP had not conducted audits at all, but instead had done "anti-audits." He argued that the contract terms were clear; they allowed defendants to obtain access to any Garden City records to audit them individ-

ually. The defendants, did not, however, review or audit every file with claimed errors before seeking reimbursement. Garden City argued that defendants were required to prove that any claim actually contained errors before seeking reimbursement for these errors. It further asserted that defendants could not merely project errors onto claims that they had not reviewed and then collect based on those projections. The contracts did not expressly allow them to do this, Garden City contended; hence, this method was not a permissible means of proving that they were entitled to be reimbursed for overpayments. However, Garden City's counsel conceded that if it were granted partial summary judgment, defendants would be free "to go back and do an actual file-by-file review."

The defendants countered that either the term "audit" in the agreements was sufficiently undefined or an essential term was missing, such that an ambiguity in the contract terms was created. In addition they asserted that it would not be administratively feasible to inspect thousands of claims individually for errors. Furthermore, they argued that similar extrapolation techniques are commonly used in the Medicare context for the federal and state governments; hence, the court should allow them in this context.

The motion justice granted Garden City's motion for partial summary judgment. She found that the facts were not in dispute, and that the parties agreed that the contracts were silent on the use of statistical sampling and extrapolation. She further found that there was no previous history of dealing between the parties that would have put Garden City on notice

---

**4.** The justice that presided at this hearing was different from the justice who issued the preliminary injunction. We refer to the former

justice as the motion justice, and to the latter as the hearing justice.

that the contracts contemplated the use of sampling and extrapolation techniques. She also looked at Black's Law Dictionary for guidance on whether its various definitions of "audit" refer to statistical sampling. She found that none of the definitions referred to statistical sampling and extrapolation. She further found that the contracts were clear, that there was no missing term, and "if the parties or the defendant[s] wanted to put a method in by which they could do a sampling or extrapolation, I think they could have done that; and they did not do that."

On June 6, 2003, an order was entered reflecting the grant of partial summary judgment for Garden City for $33,684.83 in connection with the 2000 Blue CHiP commercial audit and $124,478.53 in connection with the 2000 Blue Cross audit. However, because of Garden City's pending motion for a permanent injunction, the order did not contain a ruling on counts 3 or 4 of Garden City's amended complaint. The issue of the remaining counts was adjudicated shortly thereafter, when the hearing justice who issued the preliminary injunction found that the grant of partial summary judgment was dispositive of the issues before him. As a result, he granted Garden City's motion for an injunction against defendants, permanently enjoining them from offsetting $455,547.45 in future claims as a result of the 2001 and 2002 Blue Cross audits and $434,372.21 from the 2001 and 2002 Blue CHiP commercial audits. A judgment with respect to all four counts was entered on June 30, 2003, from which defendant timely appealed.

## Discussion

■ On appeal, defendants argue that the motion justice erred in ruling that the term "audit" was clear in the contracts. They argue that she erred in supplying a meaning for the term "audit" in the contracts when the contracts themselves did not define the term. They also argue that it was error for her to rely on extrinsic sources to define an unclear term in the contracts. They also assert that the motion justice erred by refusing to consider their evidence defining the term "audit" by means of customary usage and meaning in their standard contracts. Garden City responds that the agreements are clear and unambiguous, and that the Superior Court was correct to find the acceptance of extrapolation methods in the federal Medicare context irrelevant to these contracts involving private parties. Furthermore, Garden City contends that because there were no previous discussions between the parties pertaining to the term "audit" in the contracts, what defendants intended the term to mean based on their standard contracts and dealings with other parties is irrelevant to this case.

■ Our *de novo* standard in reviewing a motion justice's decision to grant summary judgment is well established. *Roe v. Gelineau*, 794 A.2d 476, 481 (R.I.2002) (per curiam). "We shall affirm the judgment only when, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact remains to be decided, and that the moving party is entitled to judgment as a matter of law." *Id.* (citing *Heflin v. Koszela*, 774 A.2d 25, 29 (R.I.2001)).

■ Similarly, we recognize that "[a]n ambiguity in a contract cannot be resolved on summary judgment." *Rubery v. Downing Corp.*, 760 A.2d 945, 947 (R.I.2000) (per curiam) (quoting *Rotelli v. Catanzaro*, 686 A.2d 91, 95 (R.I.1996)). Furthermore, whether a contract's terms are ambiguous is a question of law. *Dubis v. East Greenwich Fire District*, 754 A.2d 98, 100 (R.I. 2000) (per curiam). "However, 'a contract is ambiguous only when it is reasonably

and clearly susceptible of more than one interpretation.'" *Rubery,* 760 A.2d at 947 (quoting *Rotelli,* 686 A.2d at 94). We have previously held "[i]n situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids." *Clark–Fitzpatrick, Inc./ Franki Foundation Co. v. Gill,* 652 A.2d 440, 443 (R.I.1994) (citing *Greenwald v. Selya & Iannuccillo,* 491 A.2d 988, 989 (R.I.1985)). In addition, the parol evidence rule bars the admission of any previous or contemporaneous oral statements that attempt to modify an integrated written agreement. *Riley v. St. Germain,* 723 A.2d 1120, 1122 (R.I.1999) (per curiam) (citing *Bourg v. Bristol Boat Co.,* 705 A.2d 969, 971 (R.I.1998)). We also adhere to the rule of interpretation that when considering "whether a contract is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning." *Rubery,* 760 A.2d at 947 (quoting *Rotelli,* 686 A.2d at 94).

The parties agree that Blue Cross and Blue CHiP had the right to request and gain access to Garden City's medical and financial records to review or audit those records. Furthermore, the parties agree that Blue Cross and Blue CHiP had the right to recover any overpayments they made to Garden City if they were overcharged for medical services provided to their subscribers. Moreover, if Blue CHiP overpaid, it had the right to recoup those overpayments by offsetting them against future claims that Garden City submitted. Finally, both parties agree that the contracts were silent about the use of sampling and extrapolation methods to determine overpayments. Clearly, nothing in the contracts explicitly allowed audits to be conducted using these techniques, but there is nothing that explicitly prevented their use, either.

■ The defendants contend that the term "audit," as used in these contracts, clearly is susceptible of more than one meaning. This may be true. However, it is virtually axiomatic that an undefined term in a contract is susceptible of more than one interpretation. We previously have noted:

> "Because ambiguity lurks in every word, sentence, and paragraph in the eyes of a skilled advocate * * * the question is not whether there is an ambiguity in the metaphysical sense, but whether the language has only one reasonable meaning when construed, *not in a hypertechnical fashion, but in an ordinary, common sense manner.*" *Textron, Inc. v. Aetna Casualty and Surety Co.,* 638 A.2d 537, 541 (R.I.1994) (quoting *New Castle County v. Hartford Accident and Indemnity Co.,* 970 F.2d 1267, 1270 (3d Cir.1992)). (Emphasis added.)

"A court should not, however, stretch its imagination in order to read ambiguity into a [contract] where none is present." *Id.* at 539 (quoting *Mullins v. Federal Dairy Co.,* 568 A.2d 759, 762 (R.I.1990)).

■ An undefined term in a contract should not carry a technical or otherwise extraordinary meaning. An ordinary person in the medical-insurance field may read the term "audit" and contemplate a record-by-record inspection of claims, whereas another may contemplate the use of sampling and extrapolation techniques. However, that is not the question that confronts us.

■ Because the contracts did not supply a technical definition for the term, we will give the term its plain, ordinary, and usual meaning. *See Rubery,* 760 A.2d at 947. In doing so, we note that this Court has used dictionaries, including Black's Law Dictionary, to aid in determining the

plain and ordinary meaning of a word. *See State v. Rhode Island Employment Security Alliance, Local 401*, 840 A.2d 1093, 1097 (R.I.2003) (employing Black's Law Dictionary to define "negotiation"). Accordingly, we find that the motion justice did not commit an error of law in consulting this source. We are mindful of Judge Hand's famous maxim that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.1945). However, we do not intend to make a fortress out of Black's Law Dictionary definition of "audit." Contracting parties are free to define a term as they see fit, but they must do so in writing if they intend the term to carry a technical definition.[5]

 The motion justice found that "[i]n this particular case we had very clear terms." She referred to Black's Law Dictionary for the definition of "audit" and found "as expected, they refer to it as a formal examination of an individual organization's accounting records, financial situation or compliance to some set of standards." Furthermore, she referred to the variety of audits that Black's defines and found that "none of them seem to me [to] refer to the statistical sampling that was being done in this case * * *." The explicit definition of "audit" is as follows:

"A formal examination of an individual's or organization's accounting records, financial situation, or compliance with some other set of standards." Black's Law Dictionary, 126 (7th ed. 1999).

In addition, there are nine specific kinds of audits defined, none of which makes reference to statistical sampling or extrapolation. *See id.* Therefore, the motion justice correctly applied the foregoing definition of "audit" to find that it anticipated a formal examination of an individual organization's accounting records. We concur with her holding, and conclude that a case-by-case or record-by-record examination more closely fits the ordinary understanding of "audit."

The defendants next argue that the motion justice erred by disregarding evidence of defendants' longstanding use of sampling techniques under similar contracts. The defendants contend that recognizing their previous use of sampling under similar contracts would promote uniform interpretation and application to all parties subject to similar contracts. We are not persuaded. The motion justice found that because there was no past history of dealing between the parties, "there was no expectation on behalf of the plaintiffs that this was the method that was going to be used, short of reading something in[to] the contract." We agree with the motion justice's analysis.

The defendants, as the drafters of the contracts, were in the superior position to know what methods they intended to employ when performing audits. They easily could have informed Garden City that in performing the audits they were going to employ sampling and extrapolation techniques to determine the amount of overpayments. Garden City asserts that the contracts were "contracts of adhesion" because defendants "established the terms of the form contracts and drafted the provisions, which were * * * presented * * * on a 'take it or leave it' basis." The motion justice doubted whether these were "adhesion contracts," but she found that defendants had drafted the contracts. This may have given the defendants a

---

**5.** We note that appealing to a source, such as Black's Law Dictionary may better aid courts and contracting parties to determine the meaning of words so the parties do not rely to their detriment on their subjective definitions of key terms in contracts.

superior bargaining position, but what is more important is that it put defendants in the best position to know what they intended to do according to the contract terms that they had drafted. If defendants treated all medical providers alike under these contracts, then they should have apprised Garden City what that treatment entailed, *e.g.*, audits employing sampling and extrapolation. Or, as the motion justice observed, "[t]he issue could very simply have been addressed by putting language in the contract."

As for defendants' argument that the motion justice erred by ignoring federal authority on the permissibility of using statistical sampling when performing audits, we find such authority irrelevant to the present case. The federal cases that defendants cite concern audits conducted according to administrative rulings of the Health Care Financing Administration (HFCA).[6] *See, e.g., Chaves County Home Health Service, Inc. v. Sullivan*, 931 F.2d 914, 915, 917–19 (D.C.Cir.1991). Although these administrative rulings are not statutory requirements, they are interpretations and standards of a federal agency, acting pursuant to a federal program. In this case, we are presented with contracts interpreted under state law. We recognize that federal courts may accept statistical sampling techniques, but we do not find that authority dispositive. Again, defendants could have alerted Garden City that they intended to employ such techniques to all claims, whether governed by state or federal law. Much to their chagrin, they did not do so.

Finally, the defendants present a *reductio ad absurdum* argument that if only those things explicitly contracted for may be employed in the relationship between the parties, then "taken to its logical—and absurd—end, the * * * argument would preclude the use of pencils and paper to conduct an audit because there is no explicit provision for the use of such things in the contract." They assert that the contracts do not expressly provide for a claim-by-claim review, so any argument to support that position must fail. The defendants' argument misses the point of the motion justice's analysis. We are not persuaded by the argument that only those things explicitly provided for by contract may be undertaken. Rather, we conclude that because an otherwise undefined term in a contract will be given its plain, ordinary, and usual meaning, then a party that intends to interpret the term in an extraordinary way, should reduce that intention to writing.

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court, to which we return the record in this case.

Justice FLAHERTY did not participate.

FLANDERS, J., concurring.

Although I concur in the result that the Court reaches, I respectfully disagree with the reasons it relies upon to reach this result. Although I agree that the motion justice properly granted Garden City Treatment Center, Inc.'s (Garden City) summary-judgment motion, I respectfully disagree with the rationale that the provider contracts in question forbade the use of statistical sampling as an auditing methodology. Rather, I would hold that the contractual language in question did not prevent Blue Cross and Blue Shield of Rhode Island and Coordinated Health Partners,

---

**6.** HFCA, the component agency of the United States Department of Health and Human Services responsible for administering the Medicare program, is now known as the Centers for Medicare and Medicaid Services.

Inc. (collectively, defendants) from using statistical-sampling methods to prove the alleged overcharges. Nevertheless, because the defendants failed to satisfy their burden of showing the propriety of the statistical-sampling methods they relied upon to justify their conclusion that a certain portion of Garden City's claims for payment were invalid—and, consequently, that defendants were entitled to recoup any overpayments from Garden City—I agree that the entry of a summary judgment in favor of Garden City was appropriate.

The defendants' use of statistical sampling was a means of proving the alleged impropriety of Garden City's claims for payment and defendants' conclusion that Garden City overcharged them. The provider agreements did not preclude them from doing so. Indeed, the contracts were silent about what methods defendants could employ to show any alleged overcharges or invalid claims. As shown below, statistical sampling is a widely accepted technique to audit, monitor, or review voluminous quantities of claims data, especially when a claim-by-claim examination would be impractical or unnecessary to guarantee the accuracy of any conclusions reached about whether defendants overpaid Garden City with respect to any of the claims at issue.

Nevertheless, I would hold that the motion justice properly granted summary judgment in favor of Garden City because defendants failed to prove the legitimacy of their statistical-sampling methods in their opposition to Garden City's summary-judgment motion. A party opposing a summary-judgment motion has an affirmative duty to set forth specific facts, by affidavit or otherwise, showing the existence of a genuine issue of material fact. *Mills v. Toselli*, 819 A.2d 202, 205 (R.I. 2003) (per curiam). Parties opposing a summary-judgment motion cannot merely rest upon their pleadings to establish the existence of a disputed factual issue that would require a trial. *Clift v. Narragansett Television, L.P.*, 688 A.2d 805, 813 (R.I.1996). And they cannot defend against a summary-judgment motion merely by suggesting that they can or will prove their conclusions and allegations later at a trial. *Granoff Realty II, L.P. v. Rossi*, 833 A.2d 354, 362 (R.I.2003) (per curiam). Here, I am of the opinion that the grant of summary judgment was appropriate solely because defendants did not satisfy their burden of showing the existence of a genuine issue of material fact with respect to the validity of their conclusions about the alleged overcharges and improper claims based on their statistical sampling of a subset of Garden City's claims for payment. Instead, defendants merely established what I consider to be an irrelevant point: that the provider agreements were ambiguous about whether the parties contemplated that defendants could use statistical sampling to prove that Garden City's claims were invalid. Although defendants indicated that, if given the opportunity, they would produce competent evidence showing that the parties anticipated defendants' use of statistical sampling when they entered into the provider agreements, this, to me, was a red herring and, in any event, it was not enough to avoid summary judgment.

I conclude that the contractual-authorization issue was irrelevant because, whether the contracts authorized statistical sampling or not, defendants were entitled, as an evidentiary matter, to use statistical sampling to prove their contention that a substantial portion of Garden City's claims were invalid and that the claims in question otherwise overstated its entitlement to receive payments from defendants under the applicable provider agreements.

Unfortunately, however, defendants erred in making contractual ambiguity the keystone of their opposition to summary judgment because the issue of whether the contracts were ambiguous in this respect was a question of law for the court to decide. *See, e.g., Rotelli v. Catanzaro,* 686 A.2d 91, 94 (R.I.1996); *Westinghouse Broadcasting Co. v. Dial Media, Inc.,* 122 R.I. - 571, 579, 410 A.2d 986, 991 (1980). Therefore, once the motion justice erroneously deemed the contracts to be unambiguous, defendants failed to show a genuine issue of material fact about whether Garden City had submitted improper claims that justified defendants' actions. And defendants also pressed an equally unavailing argument when they asserted that they would be able to produce extrinsic evidence at a later date showing that the parties contemplated statistical sampling when they entered into the agreements.

As discussed above, a party cannot defeat a summary-judgment motion by merely resting on the pleadings or by indicating that they will be able to prove their claims or defenses at some future date or at trial. Instead, defendants should have opposed Garden City's summary-judgment motion by submitting expert affidavits demonstrating the reliability of their statistical sampling and auditing conclusions with respect to the claims in question.

In fact, such auditing methods are common, and courts generally admit statistical sampling evidence to prove a given party's claims or defenses—provided expert testimony validates the methods used to reach the conclusions in question. *See generally,* Gregory Todd Jones & Reidar Hagtvedt, *Sample Data as Evidence: Meeting the Requirements of Daubert and the Recently Amended Federal Rules of Evidence,* 18 Ga. St. U.L. Rev. 721, 721 (2002) (hereinafter Jones & Hagtvedt). Hence, rather than limiting its summary-judgment oppo-

sition to contract-interpretation issues, defendants should have argued that the rules of evidence allowed them to introduce, through expert testimony, the data and conclusions they derived from the statistical-sampling techniques they used—even if the contracts had been silent on this subject and even if the contracts had failed to expressly authorize the use of such techniques.

Statistical sampling, or sample adjudication, "involves collecting samples from a given population—a small subset of the relevant persons or things—deriving statistics from this sample data, and arriving at conclusions regarding the population based upon these sample statistics." *Id.* Courts are increasingly "willing to admit evidence based upon sample data." *Id.* at 722. Thus, courts have allowed statistical-sampling evidence in motions for change of venue, trademark and advertising litigation, pornography and drug-trafficking prosecutions, copyright infringement and software-piracy cases, auditing of waste, fraud, and abuse of welfare programs, labor and employment litigation, and other contexts. *See id.* at 723–24 (collecting cases). All these courts admitted statistical-sampling results into evidence because the examination of vast quantities of data on a case-by-case basis or claim-by-claim review would be too costly and impractical to undertake. "The logic of sample adjudication, accepted by courts that have approved the technique in other contexts, is that any minor errors will tend to balance out in the end." *Chaves County Home Health Service, Inc. v. Sullivan,* 931 F.2d 914, 919 (D.C.Cir.1991).

Thus, "[m]ost often, courts allow statistical[-]sampling evidence as the basis for expert opinion testimony." Jones & Hagtvedt, 18 Ga. St. U.L. Rev. at 727. If defendants had included expert affidavits and evidentiary arguments in their opposi-

tion to Garden City's summary-judgment motion, the motion justice should have denied the summary-judgment motion and then proceeded to determine whether defendants' statistical-sampling evidence was potentially admissible as expert testimony under Rules 702 [7] and 703 [8] of the Rhode Island Rules of Evidence. Such evidence is generally admissible if it is relevant and if it will assist the trier of fact. *See State v. Wheeler,* 496 A.2d 1382, 1388 (R.I.1985). In determining whether defendants' proffered statistical-sampling evidence would assist the trier of fact in determining the amount of any alleged invalid claims or overpayments, the motion justice could have considered, for example, whether the samples that defendants examined were random and whether the samples were significant and representative enough to justify applying the rate of overpayment derived from the samples to the entire universe of Garden City's challenged claims. *See* Jones & Hagtvedt, 18 Ga. St. U.L. Rev. at 739–46 (listing factors federal courts should consider pertaining to statistical samples under the Federal Rules of Evidence).

The defendants' ability to prove their overcharge case in court did not depend on the presence or absence of a contractual provision authorizing them to use certain evidentiary techniques to establish the invalidity of Garden City's challenged claims. The rules of evidence and civil procedure—not the presence of unambiguous contract provisions—provide parties with the means of proving their claims and defenses. Jones & Hagtvedt, 18 Ga. St. U.L. Rev. at 727 (courts allow statistical sampling evidence as the basis for expert opinion testimony subject to Rule 703 of the Federal Rules of Evidence). Thus, absent some valid contractual provision or law preventing them from doing so, and subject to the rules of evidence governing the admission of expert testimony, I would hold that parties may freely use statistical sampling as a method of proving alleged overcharges in situations such as the one presented by the case at bar. *See id.*

I would also hold that the ability of defendants to use statistical sampling to prove that Garden City breached its contractual obligations by submitting invalid claims and by receiving payments for unauthorized health-care procedures did not depend on any contractual provision specifically authorizing this method of proof. Indeed, even if the relevant contracts were silent on this issue and even if (contrary to the facts in this case) they said nothing about defendants' ability to audit, verify, or monitor Garden City's claims, Garden City still was not entitled to overcharge defendants or to submit invalid claims for payment. Consequently, defendants were entitled to prove that Garden City, in fact, had submitted invalid claims or otherwise overcharged them by whatever legitimate evidentiary measures they could muster, including statistical sampling based upon analyzing and extrapolating from reliable

**7.** Rule 702 of the Rhode Island Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

**8.** Rule 703 of the Rhode Island Rules of Evidence provides:

"An experts opinion may be based on a hypothetical question, facts or data perceived by the expert at or before the hearing, or facts or data in evidence. If of a type reasonably and customarily relied upon by experts in the particular field in forming opinions upon the subject, the underlying facts or data shall be admissible without testimony from the primary source."

samples of the putative invalid claims. *See, e.g., Illinois Physicians Union v. Miller,* 675 F.2d 151, 156 (7th Cir.1982) (determining that use of statistical sampling was proper as long as the opposing party had an opportunity to rebut the initial determination of an overpayment).

In any event, far from constituting a nefarious practice or one that depends on specific contractual authorization for its validity, statistical sampling is a well-established auditing technique in situations, as here, in which a claim-by-claim review of voluminous documents may not be feasible. Thus, numerous courts have upheld its use in the context of state and federal government agencies seeking to recoup alleged Medicare and Medicaid overpayments. *See Ratanasen v. California, Department of Health Services,* 11 F.3d 1467, 1471 (9th Cir.1993) (Medicaid); *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 89–90 (2d Cir.1991) (Medicaid); *Chaves County Home Health Service, Inc.,* 931 F.2d at 919 (Medicare); *Illinois Physicians Union,* 675 F.2d at 155 (Medicaid); *In re Mercy Hospital of Watertown v. New York State Department of Social Services,* 79 N.Y.2d 197, 581 N.Y.S.2d 628, 590 N.E.2d 213, 219 (1992) (Medicaid). "[C]ourts have routinely permitted the use of statistical sampling to determine whether there has been a pattern of overpayments spanning a large number of claims where case-by-case review would be too costly." *Chaves County Home Health Service, Inc.,* 931 F.2d at 919. *See also* Kirby D. Behre & A. Jeff Ifrah, *Statisticians at DOJ May Overstate Case: Government's Use of Statistical Sampling to Prove False Claims Act Liability, Damages May Be Unreliable, If Not Impermissible,* 21 Nat'l L.J. B6 (Mar. 29, 1999) ("[C]ase law arising from Health and Human Services (HHS) recoupment actions has consistently upheld the government's use of random sampling * * *.").

Contrary to Garden City's assertions, these Medicare and Medicaid decisions do not rest on explicit statutory or contractual authority granting these agencies the right to use reasonable means, such as statistical sampling, to calculate and to recover alleged overpayments. For example, in *Chaves County Home Health Service, Inc.,* 931 F.2d at 917, the court noted that the Department of Health and Human Services did "not contend that its sample adjudication scheme for post-payment review of coverage determinations [was] based on explicit statutory authorization; it relie[d] instead on its general (and uncontested) authority to recoup overpayments from [its] providers." Thereafter, the court re-emphasized that a Department of Health and Human Services ruling (HFCA Ruling 86–1) "was *not the source of administrative authority* in these cases but merely explained and reaffirmed the Department's long-standing and well-established *practice* of conducting sample audits." *Chaves County Home Health Service, Inc.,* 931 F.2d at 923 (emphases added); *see also Mercy Hospital of Watertown,* 581 N.Y.S.2d 628, 590 N.E.2d at 216, 217 (upholding statistical sampling in Medicaid recoupment action even though "the legislation delegating to DSS the authority to administer the Medicaid program does not expressly or impliedly authorize the use of random sample audits").

Here, as in the Medicare and Medicaid cases, I would hold that defendants did not need any contractual or statutory authorization to use statistical sampling as a means to prove and recover overpayments for uncovered or otherwise invalid claims that were contrary to what the contracts required to trigger claims payments by defendants. In any event, the provider agreements broadly stated that defendants "shall have the right, upon request, to verify all * * * medical records * * * for

the purpose of monitoring billing." As in the above-cited cases upholding statistical sampling as a method of proving overcharges, I conclude that defendants properly used statistical sampling as a billing verification or monitoring technique—pursuant to this above-quoted contractual authority for them to do so. The contract did not purport to limit the means or methods that defendants might use to accomplish the billing verification and monitoring that the contract expressly permitted. Thus, I would hold that even if they needed contractual authorization to engage in statistical sampling, defendants' general contractual right to "monitor[ ] billing," "to verify all * * * medical records," and to recoup overpayments granted them the right to use statistical sampling as a means to monitor Garden City's billing, verify its claims, and recoup any resulting overpayments.

In addition, notwithstanding Garden City's arguments to the contrary, the above-cited Medicare and Medicaid decisions did not turn on the fact that the party seeking recoupment was a federal or state government agency, as opposed to a private health-care insurer. The courts issuing these decisions did not cite any legal or public-policy reasons that would limit their holdings to government agencies seeking to recover publicly-funded reimbursements. Indeed, as mentioned previously, courts have accepted statistical sampling evidence in a variety of civil-litigation contexts—such as trademark and advertising cases—in which neither party was a government agency. *See* Jones & Hagtvedt, 18 Ga. St. U.L. Rev. at 723–25.

### Conclusion

This is a case about alleged overpayments by health-care insurers to a health-care provider based on the provider's alleged submission to the insurers of supposedly invalid claims for payment. The de-

fendant health-care insurers were entitled to prove such alleged invalid claims and overpayments by whatever legitimate means they could use to do so—including statistical sampling—regardless of whether the contracts in question specifically allowed them to prove such overcharges by this method. Although the contracts expressly allowed defendants to verify medical records and to monitor Garden City's billing, defendants failed to show, opposing Garden City's summary-judgment motion, that the statistical sampling methods they used to monitor and verify Garden City's billing were legitimate and valid.

Based on the foregoing analysis, the motion justice's grant of summary judgment would have been inappropriate if the defendants had opposed the motion by submitting one or more expert affidavits establishing the validity of their statistical-sampling methods. Instead, the defendants limited their opposition to proving an irrelevant point: that the provider agreements were ambiguous about permitting the use of statistical-sampling methods to audit Garden City's payment claims. But regardless whether the contracts were ambiguous, silent, or expressly permitted the defendants to use statistical sampling, I am of the opinion that, absent any contractual provision or law barring them from doing so, the defendants were entitled to use such methods to prove that they overpaid Garden City because of its alleged submission of invalid claims.

Although the motion justice improperly found the agreements in question to be unambiguous, I nevertheless conclude that the court properly granted summary judgment to Garden City. I do so because the defendants did not satisfy their burden of showing the existence of a genuine issue of material fact about the validity of the statistical-sampling methods they used to justify their actions vis-à-vis the alleged over-

payments. *See Thibodeau v. Metropolitan Property & Liability Insurance Co.*, 682 A.2d 474, 475 (R.I.1996) (per curiam) (recognizing that this Court can affirm the grant of summary judgment on a basis not relied on by the court below if supported by law and the record). Consequently, I would hold that the court properly granted summary judgment against the defendants, albeit for different reasons than those relied upon by the majority of my colleagues.